Monique Olivier (SBN 190385)
Christian Schreiber (SBN 245597)
OLIVIER SCHREIBER & CHAO LLP
201 Filbert Street, Suite 201
San Francisco, CA 94133
Tel: (415) 484-0980
Fax: (415) 658-7758
monique@osclegal.com
christian@osclegal.com

BERGER MONTAGUE PC
Hans Lodge (MN Bar 397012)
*(Admitted Pro Hac Vice)*
1229 Tyler Street NE, Suite 205
Minneapolis, MN 55413
Telephone: (612) 607-7794
hlodge@bm.net

*Attorneys for Plaintiff*
THOMAS JOHNSON

# UNITED STATES DISTRICT COURT

## NORTHERN DISTRICT OF CALIFORNIA

### SAN FRANCISCO DIVISION

| | |
|---|---|
| THOMAS JOHNSON,<br><br>    Plaintiff,<br><br>  v.<br><br>CONTEMPORARY INFORMATION CORPORATION, a California Corporation, and DOES 1-25,<br><br>    Defendants. | Case No.: 3:21-cv-05802-JD<br><br>**PLAINTIFF'S OPPOSITION TO DEFENDANT CONTEMPORARY INFORMATION CORPORATION'S MOTION TO DISMISS**<br><br>Hearing Date: October 4, 2021<br>Time:  9:30 a.m.<br>Location: Courtroom C, 15th Floor<br><br>Hon. James Donato |

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

## I.   INTRODUCTION

Plaintiff's complaint states a claim upon which relief may be granted. Defendant violated the law when it assembled and sold a screening report to Plaintiff's prospective employer, which falsely labeled Plaintiff as a registered sex offender and criminal, with a prior conviction for possession of child pornography. Defendant's report was inaccurate because it was patently incorrect—Plaintiff is not a registered sex offender, nor has he ever been convicted of possession of child pornography. In fact, court records that are easily accessible online confirm that the actual registered sex offender and criminal has a different middle name and date of birth than Plaintiff.

Defendant's arguments in support of dismissal fail. Specifically, Defendant's effort to disavow liability by pointing to language on the report that simultaneously (and falsely) proclaims that Defendant both uses "industry best practices" and that the user should doublecheck Defendant's work by doing its own comparison of original records to the consumer's information runs counter to the FCRA's requirement that consumer reporting agencies, not end users, must use reasonable procedures to ensure "maximum possible accuracy" in reports. Defendant's claim that Defendant did not cause Plaintiff's damages because Plaintiff's prospective employer should or could have discovered Defendant's error fails for the same reason. And, Defendant's efforts to stretch the Eleventh Circuit's decision in *Erickson v. First Advantage Background Servs. Corp.*, 981 F.3d 1246, 1251 (11th Cir. 2020) to encompass this case are misguided. *Erickson* is not the law in the Ninth Circuit, involved substantially different facts and language, was decided after a trial, and contains an explicit note that the opinion should not be used in the way proposed by Defendant. *Erickson's* fundamental premise is also contrary to the purpose of the FCRA. Defendant's motion should be denied.

## II.   RELEVANT FACTUAL ALLEGATIONS AND PROCEDURAL HISTORY

On or about November 9, 2020, Plaintiff applied for a full-time employment position with a property management company operating in the greater Oakland area. Dkt. 1-2 (Compl. ¶¶ 27-28). On or about November 12, 2020, after Plaintiff worked a full-day tryout shift, the property management company notified Plaintiff that he was hired and was scheduled to begin his full-time

employment on November 16, 2020. *Id.*, ¶¶ 30-31. The company requested a copy of Plaintiff's driver's license and his Social Security number to request his background screening report prior to his official start date. *Id.*, ¶ 31.

On November 13, 2020, the property management company requested Plaintiff's background screening report from Defendant. *Id.*, ¶ 35; Dkt. 9-2. That same day, Defendant completed Plaintiff's background screening report, which contained sex offender registration information from the Virginia Sex Offender Registry and two criminal convictions for Possession of Child Pornography from Roanoke County, Virginia. Dkt. 1-2 (Compl. ¶¶ 36-39); Dkt. 9-2. Neither the sex offender registration records and information nor the Possession of Child Pornography criminal convictions belong to Plaintiff. Dkt 1-2 (Compl. ¶¶ 40-41). In fact, public record confirms that Plaintiff is not a Registered Sex Offender and has never been charged or convicted of a sex-related crime. *Id.*, ¶ 42. A cursory review of the criminal records as reported by Defendant in Plaintiff's background screening report, and as reported in the widely available underlying public court records from Roanoke County Circuit Court in Virginia, confirms the records belong to an unrelated consumer, Registered Sex Offender Thomas *Eugene* Johnson. *Id.*, ¶ 43; Dkt. 9-2 (emphasis added). The discrepancies that should have caused Defendant to realize Plaintiff is not the same person as Registered Sex Offender Thomas Eugene Johnson include the following:

    a)  Plaintiff's legal name is "Thomas Johnson" (no middle name) and the sex offender registration information and court records belong to a "Thomas *Eugene* Johnson," which is indicated both on the face of the background screening report and in the widely available Virginia Sex Offender Registry and underlying public court records from Roanoke County Circuit Court;

    b)  Plaintiff's full date of birth is indicated on the first page of the background screening report. It is not the same month or day as the date of birth for Registered Sex Offender Thomas Eugene Johnson's date of birth, which is indicated in the available underlying public court records from Roanoke County Circuit Court;

    c)  Plaintiff's address information and history, which is stated in pages 4 through 7 of the background screening report, confirms that Plaintiff currently resides in Oakland, California and did not live in Vinton, Virginia when Registered Sex Offender Thomas Eugene Johnson resided in Vinton and committed and was convicted of the sex offenses in 2012 and 2013, respectively; and

    d)  Plaintiff has *never* been charged or convicted of a sex-related crime.

Dkt. 1-2 (Compl. ¶ 43(a-d)); ECF No. 9-2. In addition to the sex offender registration information and

1   stigmatizing criminal convictions that do not belong to Plaintiff, Defendant's background screening

2   report regarding Plaintiff included the following language (hereafter "Disavowal"):

> The reporting of criminal records varies according to restrictions placed on reporting
> by the different court jurisdictions. While industry best practices has been applied in
> the attempt to accurately match and report the following information, the end user
> should cross check the applicant supplied information with the date of birth, middle
> name, physical descriptors and geographical areas where the applicant has lived to
> determine a positive match. Any criminal records listed herein must be carefully
> reviewed by the end user of this report prior to making any decision. If you need
> assistance please call 800-288-4757 x1.

Dkt. 9-2.

On or about November 14, 2020, the property management company rescinded Plaintiff's offer of employment as a direct result of the criminal record information contained within the background screening report Defendant prepared regarding Plaintiff. Dkt. 1-2 (Compl. ¶¶ 46 & 54). After finally obtaining a copy Defendant's background screening report from the property management company's owner, Plaintiff disputed the inaccurate information in the report with Defendant on December 1, 2020. *Id.*, ¶¶ 49-51. On December 2, 2020, Plaintiff received email correspondence from Defendant's Director of Compliance confirming that it had reinvestigated his dispute and removed the sex offender registration information and criminal records from his report. *Id.*, ¶ 52. An updated copy of Defendant's report confirmed the status of the "Nationwide Criminal, Sex Offender, OFAC & Interpol Scan of Best Available Databases" section indicated: "No Criminal Activity and Sex Offender Hits Found in U.S. with Available Databases." *Id.* By the time Defendant completed its reinvestigation and corrected Plaintiff's report, the property management company was no longer interested in considering Plaintiff for employment. *Id.*, ¶ 53. Defendant's false report cost Plaintiff a promising and well-paying job opportunity; Plaintiff was set to earn approximately $40.00 per hour working full-time on the Maintenance Team. *Id.*, ¶ 55. Due to Defendant's failings, Plaintiff was unemployed for approximately two months thereafter. *Id.*, ¶ 56.

Plaintiff filed this lawsuit on June 25, 2021 in Alameda County Superior Court, alleging claims against Defendant for its negligent and/or willful failure to maintain reasonable procedures to assure maximum possible accuracy of the information contained in Plaintiff's background screening

report, in violation of 15 U.S.C. § 1681e(b) and its analog, Cal. Civ. Code § 1786.20(b). *Id.*, ¶¶ 59-73. Defendant removed this case to this Court on July 28, 2021. Dkt. 1.

## III.    LEGAL STANDARD

Rule 8(a)(2) of the Federal Rules of Civil Procedure requires the complaint to provide "a short and plain statement of the claim showing that the pleader is entitled to relief." To meet that rule and survive a Rule 12(b)(6) motion to dismiss, a plaintiff must allege "enough facts to state a claim to relief that is plausible on its face." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007). This calls for enough "factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (citing *Twombly*, 550 U.S. at 556). The plausibility analysis is "context-specific" and "requires the reviewing court to draw on its judicial experience and common sense." *Id.* at 679. All factual allegations set forth in the complaint "are taken as true and construed in the light most favorable to [p]laintiffs." *Lee v. City of Los Angeles*, 250 F.3d 668, 679 (9th Cir. 2001).

## IV.    ARGUMENT

The FCRA "was crafted to protect consumers from the transmission of inaccurate information about them" and the FCRA's "consumer oriented objectives support a liberal construction of the FCRA." *Guimond v. Trans Union Credit Info. Co.,* 45 F.3d 1329, 1333 (9th Cir. 1995). Section 1681e(b) of the FCRA and its analog, Cal. Civ. Code § 1786.20(b) of the ICRAA, both require that "[w]henever a consumer reporting agency prepares a consumer report it shall follow reasonable procedures to assure maximum possible accuracy of the information concerning the individual about whom the report relates."

"In order to make out a prima facie violation under § 1681e(b), a consumer must present evidence tending to show that a credit reporting agency prepared a report containing inaccurate information." *Guimond*, 45 F.3d at 1333. "The reasonableness of the procedures and whether the agency followed them will be jury questions in the overwhelming majority of cases." *Id.* California Civil Code § 1786.20(b), the ICRAA provision under which Plaintiff has also alleged a claim, uses identical language to § 1681e(b) of the FCRA. Cal. Civ. Code § 1786.20(b) (investigative consumer

reporting agency "shall follow reasonable procedures to assure maximum possible accuracy…." )
Therefore, Plaintiff's ICRAA claim is to be analyzed in line with the FCRA case law interpreting
§ 1681e(b). *See Gilberg v. California Check Cashing Stores, LLC*, 913 F.3d 1169, 1176 (9th Cir.
2019) (construing the law in the FCRA and ICRAA to be identical).

To determine whether a consumer report is inaccurate within the meaning of the FCRA, the
court must find the consumer report is (1) "patently incorrect" or (2) "it is misleading in such a way
and to such extent that it can be expected to adversely affect credit decisions." *Gorman v. Wolpoff &
Abramson, LLP*, 584 F.3d 1147, 1163 (9th Cir. 2009).

To create an issue of fact as to causation, a plaintiff must produce evidence that the alleged
inaccurate entry was a "substantial factor" in the denial of credit, adverse credit, or other harm.
*Bradshaw v. BAC Home Loans Servicing, LP*, 816 F. Supp. 2d 1066, 1075 (D. Or. 2011); *see also
Fregoso v. Wells Fargo Dealer Servs., Inc.,* No. CV 11-10089 SJO AGRX, 2012 WL 4903291, at *7
(C.D. Cal. Oct. 16, 2012); *see also Gorman,* 584 F.3d at 1174 (9th Cir. 2009) (holding evidence that
the creditors denied the plaintiff credit or offered higher interest rates due to the delinquencies in the
report was sufficient to establish causation and damages).

> **A.      Plaintiff Has Sufficiently Plead That Defendant's Background Screening
> Report Is Patently Incorrect.**

A consumer report is inaccurate if it is "patently incorrect." *Gorman*, 584 F.3d 1147 at 1163.
Accuracy under the FCRA requires more than "merely allowing for the possibility of accuracy."
*Cortez v. Trans Union, LLC*, 617 F.3d 688, 709 (3d Cir. 2010). Indeed, there is a "dramatic" difference
between mere "accuracy" and "maximum possible accuracy." *Id.* Simply allowing for some chance
or possibility of accuracy is insufficient. *Id.* The second prong of the court's "accuracy" analysis is
whether a consumer report "is misleading in such a way and to such extent that it can be expected to
adversely affect credit decisions." *Gorman,* 584 F.3d 1147 at 1163. "A consumer report that contains
***technically*** accurate information may be deemed 'inaccurate' if the statement is presented in such a
way that it creates a misleading impression." *Id.* (emphasis in original). "There are, of course, inherent
dangers in including any information in a credit report that a credit reporting agency cannot confirm

is related to a particular consumer. Such information is nearly always 'used or expected to be used or collected in whole or in part for the purpose of serving as a factor in establishing the consumer's eligibility for ... credit.' Allowing a credit agency to include misleading information as cavalierly as Trans Union did here negates the protections Congress was trying to afford consumers and lending institutions involved in credit transactions when it enacted the FCRA." *Cortez*, 617 F.3d at 710.

Here, Plaintiff has sufficiently plead that Defendant's background screening report is patently incorrect. *See* Dkt. 1-2 (Compl. ¶¶ 38, 40-43 & 46). Defendant incorrectly matched sex offender registration information from the Virginia Sex Offender Registry and two criminal convictions for Possession of Child Pornography to Plaintiff despite the fact that the information and records reported clearly belong to an unrelated consumer who does not share Plaintiff's personal identifying information (other than first and last name and year of birth). *Id.*, ¶¶ 39; 40-43. Plaintiff is not on the Virginia Sex Offender Registry, is not a sex offender, and has never been charged or convicted of Possession of Child Pornography. *Id.*, ¶¶ 40-42. Widely available public records related to the criminal offenses reported by Defendant from Roanoke County Circuit Court—and the identification information contained on the face of the report—confirm that the sex offender registration information and convictions belong to an unrelated consumer, Registered Sex Offender Thomas Eugene Johnson. *Id.*, ¶ 43.

Prior to preparing Plaintiff's report, Defendant had in its possession Plaintiff's full name, full date of birth, Social Security number, and current address, all of which was provided by Plaintiff's prospective employer. *See* Dkt. 9-2. Had Defendant taken its obligations under the FCRA and ICRAA seriously, it would have cross-referenced Plaintiff's personal identifying information with the widely available public record information for Registered Sex Offender Thomas Eugene Johnson and discovered multiple important discrepancies prior to falsely including his sex offender registration information and criminal convictions in Plaintiff's report. Dkt. 1-2 (Compl. ¶ 43).

First, Plaintiff's legal name is "Thomas Johnson" and the sex offender registration information and court records belong to "Thomas Eugene Johnson," which is clearly indicated both on the face of the report, in the Virginia Sex Offender Registry, and in the underlying public court records from

Roanoke County Circuit Court. *Id.*, ¶ 43(a). Second, Plaintiff's date of birth is indicated on the first page of the report and it is not the same month or day as Registered Sex Offender Thomas Eugene Johnson's date of birth, which is indicated in the widely available underlying public court records from Roanoke County Circuit Court. *Id.*, ¶ 43(b). Third, Plaintiff's address information and history is stated in pages 4 through 7 of the report and confirms that Plaintiff did not reside in Vinton, Virginia when Registered Sex Offender Thomas Eugene Johnson committed and was convicted of the sex offenses in 2012 and 2013. *Id.*, ¶ 43(c). Despite all of this disqualifying personal identifying information, Defendant admittedly based its match solely on first name, last name, year of birth, and former state of residence only. Mot. at p. 7. When Plaintiff disputed his report, providing no information beyond that which Defendant could and should have found on its own, Defendant conceded the report was inaccurate and corrected it. Dkt. 1-2 (Compl. ¶¶ 52-53).

Defendant does not contest that it reported records that are not Plaintiff's. Instead, Defendant relies on the vague and confusing Disavowal in its report to try to avoid liability. Defendant's effort to disavow its legal obligations fails for multiple reasons. First, the Disavowal is *itself* false. Defendant's claim that "industry best practices has (*sic*) been applied in the attempt to accurately match and report the following information[]…" is simply not true. Dkt. 9-2 at p. 4. If Defendant's procedures were "industry best," it would not have produced an inaccurate report in the first instance. Had Defendant actually used "industry best practices," it would have used *all* the personal identifying information it had available to it, which would have resulted in the exclusion of obvious non-matches such as the one it furnished to Plaintiff's potential employer. Instead, Defendant used a patently unreasonable matching procedure, which falls well short of 15 U.S.C. § 1681e(b)'s "maximum possible accuracy" mandate, as well as "industry best practices." Dkt. 1-2 (Compl. ¶¶ 44 & 57).

Second, Defendant's attempt to shift the FCRA's "reasonable procedures to assure maximum possible accuracy" mandate on to the end user is contrary to law. Defendant cannot disavow its way out of its own legal obligations. *Defendant*, not its customers, is the party that the FCRA requires to "follow reasonable procedures to assure the maximum possible accuracy" of the information contained in its reports. Defendant's Disavowal states that "the end user should cross check the

applicant supplied information with the date of birth, middle name, physical descriptors and geographical areas where the application has lived to determine a positive match." Dkt. 9-2 at p. 4. The FCRA's statutory mandate requiring "maximum possible accuracy," however, applies to consumer reporting agencies like Defendant, not end users. Thus, the language in the Disavowal is, on its face, contrary to the law, and its intended effect is to relieve Defendant of its statutory obligations.

Third, the language of Defendant's Disavowal does not support the purpose for which Defendant seeks to use it here. Defendant's Disavowal sends incoherently mixed messages, claiming both that it uses "industry best" practices, while simultaneously advising its users to take such basic steps as comparing the consumer's name with the offender's name, comparing the consumer's date of birth with the offender's date of birth, and comparing the consumer's address history with the offender's address history. While Defendant now seeks to avoid liability by focusing on the latter part of the Disavowal, it ignores the way in which its false boast undercut its subsequent advice. There is no reason to doublecheck the work of a consumer reporting agency using "industry best practices" on such basic tasks as name and date of birth matching.  Moreover, the Disavowal nowhere states that the information itself is, or even may not be, accurate. Instead, it again (falsely) seeks to blame "restrictions placed on reporting by the different court jurisdictions" for its own incompetence. No such restrictions were present here. Defendant could, and should, have determined on its own that Plaintiff was not a match. Given this backdrop, there is no reason for the Court to conclude that Defendant should not be held liable for its failure to meet the legal obligations imposed on it by the FCRA.

Finally, Defendant's Disavowal implicitly acknowledges the inadequacy of its own report. The Disavowal anticipates errors but characterizes them as the result of "restrictions placed on reporting by the different court jurisdictions." Dkt. 9-2 at 4. The "restrictions" to which Defendant seeks to refer are far from transparent. To the extent "restrictions" is a euphemism for Defendant's own failure to obtain full court records as a result of its choice to instead rely on sources that provide only partial information, this language too is misleading. If anything, the Disavowal indicates that

Defendant was *aware* that at the time it furnished the inaccurate report, it did not have complete data. Rather than falsely implying that this was the result of some court's "restriction," Defendant should have taken the additional steps required to ensure the report was maximally accurate. Courts have not placed restrictions on the accuracy of reporting, or more specifically, the accurate reporting of sex offender registry information and criminal records. In fact, consumer reporting agencies are required to ensure maximum possible accuracy in the preparation of consumer reports, which is defined liberally under the FCRA. The fact that the Virginia Sex Offender Registry does not provide a full date of birth in its publicly available data on the internet is not a "restriction" by court jurisdictions but a fact that indicates more research must be conducted (i.e. obtaining the court records associated with the sex offense, which do contain the full date of birth) before furnishing such consequential information. In fact, Registered Sex Offender Thomas Eugene Johnson's month and day of birth, both of which do not match Plaintiff's, are readily available online through the Virginia Judiciary online case records. All Defendant had to do was visit an additional website. In sum, under the standard established in *Gorman*, Plaintiff has sufficiently plead that Defendant's report is patently incorrect and is therefore in violation of the FCRA, 15 U.S.C. § 1681e(b) and ICRAA, Cal. Civ. Code § 1786.20(b).

### B.   *Erickson* Is Not Controlling.

Defendant relies almost entirely on the Eleventh Circuit's decision in *Erickson v. First Advantage Background Services Corp.* to support its argument that because of the language included in its Disavowal, Plaintiff's report was not inaccurate or misleading by the standard of § 1681e(b). *Erickson* is, of course, not binding on this Court. But even if were, the Court should not follow it. The facts and procedural posture of *Erickson* differ in important ways from those presented here. The language of the opinion itself states that its holding should not be extended to vague efforts to avoid liability through means such as the Disavowal. And, finally, even if the Court were to find it factually similar (it is not), procedurally similar (it is not), and applicable (it is not), *Erickson*'s fundamental premise is flawed, and the Court should not follow it.

First, *Erickson* is readily distinguishable on its facts. In *Erickson*, the end user of the consumer

reports, Little League, contracted with background check company First Advantage to obtain background reports on its applicants. 981 F.3d at 1248. In an intentional attempt to cast a broad net, Little League's agreement with First Advantage specified that First Advantage would search for sex-offender records using only an applicant's first and last name in any jurisdictions where First Advantage's records database lacked complete dates of birth. *Id.* at 1249. If a name-only search returned a result, Little League would need to review available demographic data from the relevant State's website before determining that a sex-offender record actually belonged to an applicant. *Id.* At the direction of Little League, First Advantage searched its database using Erickson's identifying information and did not find any matching criminal records. *Id.* But it did find a sex-offender record: a "Keith Dodgson" in Pennsylvania (which, at the time, matched plaintiff's first and last name). *Id.* That match was obtained by a name-only search because the database did not include the sex offenders' complete dates of birth. *Id.* After identifying the sex-offender record that matched Erickson's (then Dodgson's) name, the report stated "This Record is matched by First Name, Last Name ONLY and may not belong to your subject. Your further review of the State Sex Offender Website is required in order to determine if this is your subject." *Id.* The report then directed Little League to Pennsylvania's sex-offender data to compare the "demographic data and available photographs," noting that Little League might "conclude that the records do not belong to" Erickson (then Dodgson). *Id.*

The Eleventh Circuit held that First Advantage's report was factually correct because it contained a notice that accurately informed Little League it was a name-only search and cautioned that the record might not be the plaintiff's. *Id*. at 1252. The court reasoned that the report never assigned the sex-offender record to the plaintiff, and the report specifically suggested that the record might not be connected to plaintiff. *Id*. "Simply put, the report was what it said it was—an alert that someone by the name of Keith Dodgson had a Pennsylvania sex-offender record." *Id.*

Here, Defendant's consumer report and Disavowal are plainly distinguishable from the consumer report prepared by First Advantage in *Erickson*. Defendant's Disavowal does not alert the end user that the records contained in Plaintiff's report were matched by "First Name, Last Name

1    ONLY," nor does it state that the records reported may not belong to Plaintiff. Dkt. 9-2 at p. 4.

2    Defendant's Disavowal also fails to communicate that further review of the State Sex Offender

3    Website is required to determine if the records belong to Plaintiff. *Id.* Instead, the Disavowal here

4    contains a false and misleading *assurance* that Defendant applied "industry best practices" to

5    accurately match and report the criminal record information. *Id.*

6         Second, *Erickson* is distinguishable based on its procedural posture. Evidence in the trial

7    record about the nature of the communications between the consumer reporting agency and the

8    employer was critical in *Erickson*, as it established that the consumer reporting agency and the user

9    were both aware of exactly what the report represented—not a match, but only a possible match, and

10   one that had been explicitly directed by the user and that the user had agreed to further investigate. In

11   *Erickson*, the plaintiff developed a full record that included the nature of the disclaimer provided to

12   Little League – sufficient for the Court to conclude that the report was "what it said it was." 981 F.3d

13   at 1252. Here, there is no evidence of the parties' prior communications or agreement and the report

14   itself contains a (false) boast about the "industry best" procedures used to prepare it, clearly suggesting

15   that, unlike Little League, the user here had every reason to believe the record was a match to Plaintiff

16   , not merely a record that happened to contain the same name.

17        Third, even on its own terms, *Erickson* should not be extended to apply here. The *Erickson*

18   court was careful to limit its decision to the specific facts presented in that case and warned consumer

19   reporting agencies that they could not disavow their way out of the FCRA: "[t]o be sure, this is not a

20   license to caveat one's way out of liability for an affirmatively misleading report. . . Nor will vague

21   equivocations like 'the criminal history cited may not be 100 percent accurate' suffice to save an

22   otherwise misleading report." 981 F.3d at 1253. The *Erickson* court further emphasized that its

23   decision was based on the unique facts of the case and the Little League's evident understanding of

24   what the report meant and how it was to be used. *Id.* at 1253.

25        Here, Defendant's report was inaccurate and misleading. Plaintiff's employer would have had

26   no reason to doubt the accuracy of the report because it was not informed that the sex offender records

27   were a "name-only" match or that it was required to review the State Sex Offender Website to

28

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

determine whether the records were accurately matched to Plaintiff. Instead, the face of the report assures the employer that Defendant used "industry best practices" to "accurately match and report the following information[]…." Dkt. 9-2 at p. 4. Thus, there is nothing in Plaintiff's report that would make a reasonable user understand that the records reported by Defendant belonged to anyone other than Plaintiff. Indeed, this is precisely what occurred; Plaintiff's employer thought the records belonged to Plaintiff and withdrew his job offer as a result. It should not be surprising that under these circumstances, the employer concluded the report furnished was about the Plaintiff because that was what the employer ordered. Plaintiff would plausibly states a claim because the inclusion of the sex offender record in the report left the misleading impression that the information was about Plaintiff. *See Gorman*, *supra*; *see also Koropoulos v. Credit Bureau, Inc.*, 734 F.2d 37, 40 (D.C. Cir.1984) ("Certainly reports containing factually correct information that nonetheless mislead their readers are neither maximally accurate nor fair to the consumer ...."); *Kianpour v. Wells Fargo Bank, N.A.*, No. CV1701757SJOGJSX, 2017 WL 8292776, at *11 (C.D. Cal. July 17, 2017).

Finally, even on the limited terms on which it was decided, Plaintiff submits that *Erickson* was wrongly decided. Essentially, the Eleventh Circuit allowed the consumer reporting agency and one of its customers to contractually agree that the FCRA's baseline requirement of reasonable procedures to assure maximum possible accuracy would not apply to the reports issued to Little League. While the Eleventh Circuit framed its analysis in terms of a close reading of the disclaimer on the report and concluded that the report was technically true because it disclosed that the match in that case was based on name only, the Eleventh Circuit lost sight of the fundamental purpose of the FCRA: to protect *consumers*. Interpreting the FCRA to allow consumer reporting agencies to *contract* their way out of their statutory obligations by agreeing that end-users can instead contractually assume those obligations is fundamentally no different than allowing consumer reporting agencies to *disclaim* their way out of those obligations in the first place. The whole point of the FCRA is to ensure that consumer reporting, as an industry, is regulated in such a way as to ensure that consumer reports are generated using reasonable procedures designed to ensure maximum possible accuracy for *consumers*. *Erickson* creates the all too real specter of a world where consumers cannot obtain redress

for information that harmed them because the entities who disseminated that information using unlawful unreasonable procedures (such as partial name matching only ) can avoid liability by simply saying "but we told you what our unreasonable procedures were, therefore our report is true because, using those unreasonable procedures, you are a match" This is Kafkaesque and the Eleventh Circuit should have never countenanced this legalistic sophistry. The Court need not share Plaintiff's fundamental disagreement with *Erickson*, as the factual and procedural distinctions between the two cases, and *Erickson's* own attempt to limit its scope, are sufficient to render it inapplicable here. However, the fact that Erickson's fundamental premise would allow consumer reporting agencies to contract away legal obligations imposed by Congress in order to protect consumers bears careful consideration by this Court.

Here, Plaintiff has plead an inaccuracy in Defendant's report, though it is also plainly misleading. That is all he is required to do. Thus, Defendant's motion should be denied.

### C.    Plaintiff Has Sufficiently Plead That Defendant's Inaccurate Report Caused His Injuries.

Plaintiff has sufficiently plead that Defendant's inaccurate background screening report, which was used for employment purposes, caused his injuries. Dkt 1-2 (Compl. ¶¶ 54-56, 58, 64 & 73). Plaintiff plausibly claimed that Defendant's failure to follow reasonable procedures in the preparation of his background screening report caused his report to be inaccurate which in turn caused him actual damages, including but not limited to, loss of employment opportunities, lost wages, reputational damage, and emotional distress. *Id.*, ¶ 58. It is not the Court's responsibility to decide the merits of the claims at this stage in the litigation. Rather, the Court must only determine whether Plaintiff's Complaint states a claim that is plausible on its face.

Defendant argues unpersuasively that even if Plaintiff's report was inaccurate, the unlawful conduct of the property management company that requested Plaintiff's report—not Defendant's reporting—was somehow the cause of Plaintiff's alleged injuries. Mot. at p. 7. Defendant's argument is old wine in a new bottle—yet another attempt to argue that someone other than Defendant had an obligation to identify and correct Defendant's errors.

1    First, Defendant's argument that it somehow matters that the property management company

2    told Defendant the report was for tenant screening purposes but then used it for employment screening

3    purposes fails. To begin with, Defendant's argument relies on unsupported factual assertions not

4    contained in the Complaint. There is zero factual support for Defendant's contention about what the

5    employer represented to Defendant, and the Court therefore should disregard Defendant's argument

6    entirely. But regardless, this unsupported assertion is also irrelevant.  Users of consumer reports must

7    certify *a* permissible purpose to the consumer reporting agency form which they are obtaining reports,

8    but are not limited to only that purpose. Instead, a user may obtain a report for *any* permitted purpose

9    under the statute. Employment purposes are clearly allowed. *See Daniel v. DTE Energy*, 2013 WL

10   4502151 (E.D. Mich. Aug. 22, 2013) (permissible purpose is a complete defense to claims of

11   obtaining a consumer report under false pretense), *aff'd on other grounds*, 592 Fed. Appx. 489 (6th

12   Cir. 2015).

13   Second, Defendant's effort to shift blame to its employer-client and Plaintiff fails.  What

14   Defendant appears to be arguing is that Plaintiff's prospective employer should have told Defendant

15   the report was for employment purposes, and then Defendant would have either issued a different

16   report or somehow ensured that Plaintiff had an opportunity to dispute *before* permanently losing the

17   job. (ECF 9-1 at 8). Again, however, Defendant's counterfactual assertions about the chain of events

18   that transpired find no support in Plaintiff's Complaint.  To the contrary, Plaintiff alleges that he did

19   dispute, but that by the time his dispute had been handled by Defendant, the employer was still

20   unwilling to hire him. Complaint ¶¶ 53-56.

21   But even if Defendant's counterfactual assertions were supported, they are a red herring. The

22   FCRA does not limit liability to a single actor. A consumer reporting agency and a user of a consumer

23   report may both be liable for violations of the statute, which imposes different responsibilities on

24   each. Here, one cause of Plaintiff's injuries is Defendant's inaccurate report.  Despite Defendant's

25   assertion that the cause of Plaintiff's injury is not its inaccurate report, but it's client's failure to figure

26   out that the report was inaccurate, there is nothing in the FCRA that creates an obligation for users of

27   consumer reports to be savvy, or to sift through reports to separate wheat from chaff. *Defendant's*

28

obligation to comply with the FCRA's statutory mandate of "reasonable procedures to assure maximum possible accuracy" is fixed, and it does not change based on the potential naivete of an end user. As 15 U.S.C. § 1681e(b) expressly states, "*Whenever* a consumer reporting agency prepares a consumer report it shall follow reasonable procedures to assure maximum possible accuracy of the information concerning the individual about whom the report relates." (emphasis added). There is no parallel requirement imposed on users of consumer reports. Thus, Defendant's argument that Plaintiff's alleged injuries were caused by the property management company because it allegedly failed to uncover Defendant's error is misguided. Regardless, this is not an issue that can be resolved at the pleadings stage.

Because Plaintiff has sufficiently plead that Defendant's inaccurate report caused his alleged injuries, Defendant's motion should be denied.

## V.        CONCLUSION

For the foregoing reasons, Plaintiff respectfully requests that this Court deny Defendant's motion and allow this case to proceed to discovery.


Dated: August 18, 2021                    Respectfully submitted,

                                          BERGER MONTAGUE PC
                                          OLIVIER SCHREIBER & CHAO LLP

                                          /s/ *Hans Lodge*
                                          Hans Lodge
                                          *(Admitted Pro Hac Vice)*

                                          *Attorneys for Plaintiff*